1094

INTERNATIONAL UNION OF ELEC-
TRICAL, RADIO AND MACHINE
WORKERS, AFL–CIO–CLC, an unincor-
porated association, International Union
of Electrical, Radio and Machine Work-
ers, AFL–CIO–CLC, Local 449, an unin-
corporated association, International
Union of Electrical, Radio and Machine
Workers, AFL–CIO–CLC, Local 627, an
unincorporated association, H. J. Ad-
ams, Genevieve Arnett, Josephine Bak-
er, Marge Dinnan Brophy, Henrietta
Brown, Dorothy M. Burton, Minnie
Chatman, Mary E. Cobb, A. Contento,
Melvina Cooper, Jean Corbin, Norma
Doyle, Eleanor Dye, Tanya Fourshee, D.
Fowler, Dorothy Gaines, Martha Gant,
Madeline Giese, L. M. Harris, Dorothy
Hayes, Eleanor Hunker, Pauline Lee, J.
Lindenthal, Ollie Little, Madeline Marti-
no, D. P. Massi, Rena McLeod, S.
McNeil, Patti Mitchell, Roberta Moore,
Mabel Morrell, Mildred Ociki, Helen
O'Loughlin, Mary Pfister, Ann Raho, R.
Rainear, P. Rutowski, Loretta Ryan, J.
L. Sheldon, V. Vaughn, Helen Walsh,
and Shirley Watkins, on behalf of them-
selves and on behalf of all persons simi-
larly situated,

v.

WESTINGHOUSE ELECTRIC CORPO-
RATION, a corporation,

International Union of Electrical, Radio
and Machine Workers, AFL–CIO, CLC
("IUE") and Locals 449 and 627, Appel-
lants in 79–1893,

Marge Brophy, Henrietta Brown, Melvina
Cooper, Ann Raho Frazier and Helen
Walsh, on behalf of themselves and the
class they represent, Appellants in 79–
1894.

Nos. 79–1893, 79–1894.

United States Court of Appeals,
Third Circuit.

Argued March 20, 1980.

Decided Aug. 1, 1980.

Michael H. Gottesman, Frank Petramalo, Jr., Jeremiah A. Collins, Bredhoff, Gottesman, Cohen & Weinberg, Washington, D. C., Sidney L. Reitman, Jesse H. Strauss, Kapeljohn, Lerner, Reitman & Maisel, Newark, N. J., for individual appellants.

Virginia Fenton, Carpenter, Bennett & Morrissey, Newark, N. J., Stuart I. Saltman, Westinghouse Electric Corp., Pittsburgh, Pa., Walter P. DeForest (argued), Peter D. Post, Martha Hartle Munsch, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellee Westinghouse Electric Corp.

Robert E. Williams, Douglass McDowell, McGuiness & Williams, Washington, D. C., for amicus curiae Equal Employment Advisory Council.

Norman Redlich, Co–Chairman, New York City, Norman J. Chachkin, Richard T. Seymour, Staff Attys., Lawyers' Committee for Civil Rights Under Law, Washington, D. C., for amici curiae Lawyers' Committee for Civil Rights Under Law, et al.

Winn Newman, Carole W. Wilson, Washington, D. C., Richard B. Sobol (argued), Ann H. Franke, Sobol & Trister, Washington, D. C., for Union appellants.

Leroy D. Clark, Gen. Counsel (argued), Joseph T. Eddins, Associate Gen. Counsel, Beatrice Rosenberg, Asst. Gen. Counsel, Vincent J. Blackwood, Atty., Equal Employment Opportunity Commission, Washington, D. C., Drew S. Days, III, Asst. Atty. Gen., David L. Rose, Sandra L. Hughes,

Attys., Dept. of Justice, Washington, D. C., for amici curiae Equal Employment Opportunity Commission and the United States.

Before SEITZ, Chief Judge, and VAN DUSEN and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

The plaintiffs in this case brought suit alleging, *inter alia*, that the Westinghouse Electric Corporation (Westinghouse or the company) had set the wage rates lower for those job classifications which were predominantly filled by females than the wage rates for those job classifications which were predominantly filled by males. Plaintiffs claimed that this disparity was attributable to the fact that the company deliberately paid lower wages for those types of work which would be done predominantly by women. They claimed this disparity is in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e–2–2000h–6.[1] The district court held that Title VII did not prevent sex discrimination in setting wage rates for different categories of jobs unless it could be shown that the jobs, regardless of the rea-

son for their classification, involved equal or substantially equal work. Because the plaintiffs had stated that they did not intend to prove that the jobs predominantly filled by women were the same as the jobs predominantly held by men, the court granted Westinghouse's motion for partial summary judgment. The plaintiffs appealed.

■ The instant case pushes us to the edge of subtle concepts of statutory construction. It involves sophisticated aspects of personnel policies and job classifications and it rests on a legislative history which is not totally free of ambiguity. Thus, at the outset it is essential that we make clear what is not involved in this case. Westinghouse is not being charged with the type of discrimination where different wages have been paid to men and women who are in the same classification and who perform the same work. For any classification which was predominantly filled by women, Westinghouse paid the same wage to any male who might work within that same classification. The problem here is that Westinghouse allegedly used a system which set the wage rates lower for any classification if the group covered within that category was predominantly female. Under the applica-

---

1. This action was originally part of a larger action filed in the Western District of Pennsylvania which alleged similar discriminatory practices at numerous Westinghouse facilities. The counts involving the New Jersey plants were severed and transferred to the District of New Jersey. The allegations relating to the New Jersey plants asserted that Westinghouse had violated Title VII by:

 (a) paying [women] unequal pay in that male employees performing the same or substantially the same work receive higher pay; (b) paying [women] lower rates of pay than would be paid [them] if [their] skill, effort and responsibility were evaluated on the same basis as is used in evaluating work performed by males; and (c) failing to afford [women] the rights of promotion and transfer to better paying jobs on the same basis as males; and (d) otherwise affording [women] unequal compensation, terms, conditions and privileges of employment because of [their] sex.

 Count Two, Complaint, ¶ 32, *reprinted in* App., at 25.

 It also alleged that Westinghouse:

 (1) had denied members of the plaintiff class "[t]he opportunity to work and at the same time afforded all male employees a full eight hour shift and in some instances afforded male employees additional overtime work", Count Three, Complaint, ¶ 44;

 (2) had denied members of the plaintiff class "the opportunity to work 8 hours per day as did all male employees", Count Four, Complaint ¶ 49; and

 (3) had discriminated against one of the named plaintiffs "by requiring her to stop work thereby depriving her of holiday pay, as well as her regular weekly wages, credited service, and other benefits in that she was only in her sixth month of pregnancy and was able, willing and desirous of continuing to work and had the approval of her personal physician for such work." Count Five, Complaint ¶ 53.

 App., at 25–32.

ble law it is clear that Westinghouse could not create job classifications whereby different wages were paid to one group solely because of considerations of religion, race or national origin.[2] The statutory issue here is whether Congress intended to permit Westinghouse to willfully discriminate against women in a way in which it could not discriminate against blacks or whites, Jews or Gentiles, Protestants or Catholics, Italians or Irish, or any other group protected by the Act. Because we hold that this alleged intentional discrimination in formulating classifications of jobs violates Title VII, we will reverse.

## I.

Westinghouse's present wage structure, according to the plaintiffs,[3] is derived from a wage structure Westinghouse established in the late 1930's which was described in Westinghouse's Industrial Relations Manual Wage Administration, Part 3, section 3 (1939), *reprinted in* Appendix at 110. At that time all of the job classifications at Westinghouse's Trenton, New Jersey plant were allegedly segregated by sex. The "female" jobs included assembly line jobs, sub-assembly jobs and quality control jobs. The "male" jobs included janitor, forklift operator, warehouseman, various material handling jobs, and craft jobs. For simplicity we will refer to those job classifications which are predominantly filled by women as "female" jobs and those filled predominantly by men as "male" jobs. The 1939 manual explains that the company first "point–rated" all of its jobs taking into account the knowledge and training required, and the specific demands and re-

sponsibilities of the job. It then assigned each job a numerical value, based on an evaluation of these three factors. Next each job was assigned a "grade" based on its point rating and "keysheets" were developed which set forth the hourly wage for jobs at each labor grade. The plaintiffs contend that the wage rates for female jobs were set lower than the rates for male jobs which had received the same point rating. Indeed, Westinghouse's manual stated, "The rate or range for Labor Grades [for women] do not coincide with the values on the men's scale. Basically then, we have another wage curve or Key Sheet for women *below* and not parallel with the men's curve." *Id.* at 158a (emphasis added).

In 1965 the company established a unitary key sheet in which the grades had no explicit sexual designation. The plaintiffs contend that the new wage scale, which is still in use, embodies the deliberately discriminatory policy of the prior plan. In support of their view, they contend that Westinghouse expanded the number of labor grades from nine to thirteen and generally accorded female jobs labor grades in the new scale below those of male jobs even though these jobs had been at corresponding labor grades before the merger. They also point to the fact that the vast majority of the women at the Trenton plant are still employed in the female jobs. Their records show employee assignments at the Trenton plant as of November 30, 1975 as follows:

### Westinghouse - Trenton Plant

| | Male | Female |
| --- | --- | --- |
| LG1 | 0 | 6 |
| LG2 | 0 | 33 |
| LG3 | 1 | 125 |

2. 42 U.S.C. § 2000e–2 (emphasis added) provides in pertinent part:
 (a) It shall be an unlawful employment practice for an employer—
 (1) to fail to refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, *or classify* his employees or applicants for employment in any

way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

3. On a motion for summary judgment all factual disputes are resolved against the moving party. We have therefore adopted the plaintiffs' version of the facts in our resolution of this appeal. *See Adickes v. S. H. Kress and Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970).

*Westinghouse-Trenton Plant*

| | *Male* | *Female* |
|---|---|---|
| LG4 | 0 | 18 |
| LG5 | 21 | 16 |
| LG6 | 4 | 14 |
| LG7 | 3 | 0 |
| LG8 | 2 | 0 |
| LG9 | 3 | 1 |
| LG10 | 4 | 0 |
| LG11 | 0 | 0 |
| LG12 | 19 | 0 |
| LG13 | 19 | 0 |
| | 76 | 213 |

Brief for Appellants at 10–11. This table shows that with a single exception the 183 employees working at Labor Grades 1 through 4 were women, the grades into which the female jobs were placed in 1965. Thus, eighty five percent of the women working in the plant in 1975 were assigned to these jobs. Although the plaintiffs acknowledge that "there have been some changes in job content over the years, and some rate adjustments," in their view "the changes have not eradicated the wage inequities established by the [1930] system." *Id.* at 10.

The district court held that Title VII had not been violated even if the wage scale had been set in the manner described by the plaintiffs. It reasoned that because of the Bennett Amendment, which is included in section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h), sex–based discrimination in compensation violates Title VII only if it also violates the Equal Pay Act of 1963, 29 U.S.C. § 206(d) (Equal Pay Act). The court held that the Equal Pay Act proscribes discriminatory compensation only when it is shown that the plaintiff performs the *same* work or substantially the same work of other employees. Since the plaintiffs in this case agreed that their suit did not involve classifications involving the same work or substantially the same work, the district court ruled that the plaintiffs did not have a cause of action under Title VII. *International Union of Electrical Workers v. Westinghouse Electric Corp.,* 19 FEP Cases 450 (D.N.J.1979) [hereinafter *IUE I*]. The late Judge Barlow, one of our most distinguished trial judges, summarized his holding by stating, "In conclusion, therefore, we have ruled that allegations and proof of unequal pay for unequal, but comparable, work does not state a claim upon which relief can be granted . . . ." *Id.* at 457.

In response to a motion by the plaintiffs, the district court entered final judgment on this claim and certified an order so that it could be appealed pursuant to Rule 54(b), Fed.R.Civ.Proc.[4] *International Union of Electrical Workers v. Westinghouse Electric Corp.,* 19 FEP Cases 1028 (D.N.J.1979) [hereinafter *IUE II*].

## II.

Because it affects our jurisdiction we asked the parties to brief the question of whether the district court properly certified the judgment pursuant to Rule 54(b). We conclude that the district court did not abuse its discretion when it entered the final order. *See Curtiss–Wright Corp. v. General Electric Corp.,* 446 U.S. 1, 100 S.Ct. 1460, 64 L.Ed.2d 1 (1980). The district court noted that as a result of the earlier decision, *IUE I,* the claim of sex–based wage discrimination was terminated and the issue would not be raised a second time after a trial on the remaining claims. Noting that the claim was one of statutory

---

4. Fed.R.Civ.Proc. Rule 54(b) provides:

(b) JUDGMENT UPON MULTIPLE CLAIMS OR INVOLVING MULTIPLE PARTIES. When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross–claim, or third–party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express di-rection for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

construction and did "not deal with the factual issues at the heart of the unadjudicated claims," the court felt the issue was "sufficiently distinct to permit certification." *IUE II*, 19 FEP Cases at 1029–30. The court also took into consideration the fact that the EEOC had argued that the claim involved a " 'novel issue' which is likely to recur." *Id.* at 1029. We agree that these factors weigh in favor of certification and will therefore affirm the entry of the final order.

## III.

### A.

 At the heart of this appeal lies an amendment to Title VII which was introduced by Senator Bennett of Utah in the final days of the passage of the Civil Rights Act of 1964. The Bennett Amendment (the Amendment), which was adopted as introduced by Senator Bennett and included in section 703(h) of Title VII, provides:

> It shall not be an unlawful employment practice under this subchapter for an employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of Title 29.

42 U.S.C. § 2000e–2(h). Section 206(d) of Title 29, the Equal Pay Act of 1963, proscribes sex–based discrimination in compensation for the same or substantially the same work except when the differential is the result of "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any

other factor other than sex." [5] The dispute here is about what is meant by the phrase in the Amendment "if such differentiation is authorized by".

This phrase could mean that except for the four limitations of section 206(d), Title VII has as broad a coverage on sex discrimination changes as it does in any other case. Thus, other than the four exceptions of the Equal Pay Act, there is no dilution of sex discrimination coverage in Title VII cases. This argument could be called the "broad coverage position," and is asserted by the plaintiffs and the EEOC. On the other hand, the language in the Amendment could be construed to deny sex discrimination cases the "broader coverage" and to limit the prohibition against sex–based discrimination in wages to situations where the employees are performing the same or substantially the same work, in the manner that the Equal Pay Act is limited. This later view is urged by Westinghouse.

We have not found the resolution of this dispute to be a simple one. Our research has not revealed any single document or statement which unambiguously gives the Amendment meaning. Yet, each document we have found pushes us slowly yet firmly to the conclusion that the Bennett Amendment merely incorporates into Title VII the four exceptions outlined in the Equal Pay Act, the "broader coverage position".

### B.

At the outset we note that the construction urged by Westinghouse would result in a substantial limitation on the scope of Title VII's power to address the problems of sex–

---

**5.** 29 U.S.C. § 206(d) provides in pertinent part:

(d)(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are

performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

based discrimination in employment.[6] Westinghouse's position would permit employers to discriminate against women even though they could not pursue similar discriminatory practices against others on account of race, religion or national origin. As an example, it is clear that Title VII prohibits an employer from paying more per hour to welders than plumbers *if* the reason for the employer paying higher wages to the welder is that the majority of the welders are Protestants and that the majority of the plumbers are Catholics. In such a case an employer would be "classify[ing] his employees . . . in [a] way which would deprive any individual of employment opportunities [high wages] . . because of such individual's . . . religion." 42 U.S.C. § 2000e–2(a). While Westinghouse presumably would not challenge the illegality of the scheme outlined above, it asserts that the scheme would be permissible if the reason for the wage disparity is that the majority of welders are men and the majority of plumbers women. The Supreme Court has never ruled on the statutory issue raised in this case, but in dicta in Title VII cases, the Court tends to refer to discrimination on the basis of race, religion, sex, or national origin as they are equally nefarious and equally prohibited. For in *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 763, 96 S.Ct. 1251, 1263, 47

L.Ed.2d 444 (1976) (emphasis added) (citations omitted), the Supreme Court stated:

> We begin by repeating the observation of earlier decisions that in enacting Title VII of the Civil Rights Act of 1964, Congress intended to prohibit all practices in whatever form which create inequality in employment opportunity due to discrimination on the basis of race, religion, *sex*, or national origin, . . . and ordained that its policy of outlawing such discrimination should have the "highest priority" . . . . .

In the absence of explicit statutory language or Supreme Court holdings to the contrary, we are hesitant to conclude that Title VII would allow discriminatory behavior on the basis of sex, when the same behavior would be prohibited if made on the basis of race, religion or national origin.[7]

### C.

We start our inquiry, as all inquiries involving statutory construction should, with the language of the statute. *Lewis v. United States*, 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980). The Bennett Amendment states that differentiations "authorized by" the Equal Pay Act are not unlawful. Normally the term "authorized" is used to describe something that is endorsed or expressly permitted and not, as Westinghouse suggests, something which is merely not prohibited.[8] Thus, the plain lan-

**6.** Section 703(a), 42 U.S.C. § 2000e–2(a) provides:

(a) It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

**7.** We reject the argument made by amicus Equal Employment Advisory Council that our task is easier because it is clear that Congress wished to discourage courts from becoming

involved in "massive job evaluation trial[s]" and Congress therefore limited the scope of Title VII's prohibition against sex discrimination. Since Congress was willing to permit "massive job evaluation trial[s]" if racial, religious or ethnic discrimination was charged, we cannot presume that they would be fearful of such trials involving sex discrimination.

**8.** Webster's Third New International Dictionary 146–47 (1961) defines "authorize" in the following manner:

*1a:* to endorse, empower, justify, or permit by or as if by some recognized or proper authority . . .: SANCTION . . . *b* . . . to furnish grounds for: JUSTIFY. *2* . . . to vouch for . . . *3* . . . to give legality or effective force to . . . *4a:* to endow with authority or effective power, warrant, or right: appoint, empower, or warrant regularly, legally, or officially . . . *b:* to grant or allot by proper authority . . .

guage of the Amendment lead us to the conclusion that the Amendment dilutes Title VII only to the extent that it incorporates the four wage differentials expressly endorsed or permitted by the Equal Pay Act.

Westinghouse asserts that other language in section 703(h), of which the Bennett Amendment is a part, suggests a contrary interpretation, for this language already provides for three of the four exceptions to the Equal Pay Act.[9] Westinghouse argues that most of the Bennett Amendment would be superfluous if it were limited to the four exceptions, and thus it contends the language of the Act supports its position. We do not agree. We find it more reasonable to conclude that the repetition of the exceptions in the Amendment ensured that the two statutes would be interpreted in the same manner. With the Bennett Amendment the Equal Pay Act exceptions became "applicable to Title VII as well." *General Electric v. Gilbert*, 429 U.S. 125, 144, 97 S.Ct. 401, 412, 50 L.Ed.2d 343 (1970) (Equal Pay Act provisions on pregnancy benefits are controlling). By making the acts coterminous Congress eliminated the possibility that an employer would be subject to conflicting regulations. Thus, the language is not surplusage.

Westinghouse argues that we should apply the *in pari materia* canon of statutory construction. Under this canon, "a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum. 'Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.'" *Radzanower v. Touche, Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 18 L.Ed.2d 540 (1976), *quoting, Morton v. Mancari*, 417 U.S.

535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974). We decline to apply this canon, for it is inconsistent with the Supreme Court's caution that remedies for employment discrimination "supplement" each other and should not be construed so as to ignore the differences among them. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 48–49 & n. 9, 94 S.Ct. 1011, 1019–1020 & n. 9, 39 L.Ed.2d 147 (1974). Further it conflicts with another rule of statutory construction namely, "where a statute with respect to one subject contains a specific provision, the omission of such provision from a similar statute is significant to show a different intention existed." *Richerson v. Jones*, 551 F.2d 918, 928 (3d Cir. 1977), *quoting, General Electric Co. v. Southern Construction Co.*, 383 F.2d 135, 138 & n. 4 (5th Cir. 1967); *Tooahnippah v. Hickel*, 397 U.S. 598, 606–07, 90 S.Ct. 1316, 1321–22, 25 L.Ed.2d 600 (1970). Thus, we conclude that the plain language of the statute suggests that only the four exceptions of the Equal Pay Act were incorporated as limitations on Title VII.

### D.

The legislative materials on the Bennett Amendment are remarkable only for their equivocacy and turbidity. As has oft been noted, sex was added as a protected classification late in the debate on the Civil Rights Act as the result of an amendment proposed by Representative Smith of Virginia. Probably because sex discrimination was not contemplated as part of the original bill, the "legislative history of Title VII's prohibition of sex discrimination is notable primarily for its brevity." *General Electric v. Gilbert*, 429 U.S. at 143, 97 S.Ct. at 411. The Bennett Amendment was not part of the Civil Rights Act when it had first

---

**9.** *Compare* Title VII, 42 U.S.C. § 2000e–2(h):

(h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production

or to employees who work in different locations, . . .

*with* the Equal Pay Act, 29 U.S.C. § 206(d): except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . .

passed the House and was sent to the Senate, although the Act at that time included the prohibition against sex discrimination. The Amendment was included later on the floor of the House, after cloture was adopted, following a very brief colloquy. Only a few legislative materials are available. Some are ambiguous and, as the parties before us have demonstrated, an ingenious and intelligent mind may find support in all of them for either interpretation. After our review, however, we conclude that on balance they show that Congress intended the more limited scope urged by the plaintiffs.

The first discussion of the issue of discrimination in compensation based on sex is presented by Senator Clark, one of the bill's floor managers. In April 1964 he introduced into the Congressional Record a memorandum which included his answers to questions raised by Senator Dirksen about the Civil Rights Act.[10] There he stated: "The standards in the Equal Pay Act for determining discrimination as to wages, of course, are applicable to the comparable

situation under Title VII." 11 Cong.Rec. 7217 (1964).

This passage is ambiguous as it can be interpreted to mean that Title VII is only as broad as the Equal Pay Act. It is, however, equally possible that Senator Clark simply meant that when equal work challenges were made, the Equal Pay Act was controlling and that he was not addressing the problem of discrimination of the sort alleged here. The memorandum is not helpful as a guide to interpret the Bennett Amendment, however, for the comment was made on April 4th, and the Bennett Amendment was not introduced until two months later, June 12, 1964. The passage is therefore only helpful to the extent that it suggests that there was some interest in Congress in the interrelationship of the two acts.

The second passage records the colloquy which occurred when Senator Bennett introduced his amendment to the Senate and it was subsequently approved.[11] Introduc-

---

**10.** The passage reads in its entirety:

Objection: The sex antidiscrimination provisions of the bill duplicate the coverage of the Equal Pay Act of 1963. But more than this, they extend far beyond the scope and coverage of the Equal Pay Act. They do not include the limitations in that act with respect to equal work on jobs requiring equal skills in the same establishments, and thus, cut across different jobs.

Answer: The Equal Pay Act is a part of the wage hour law, with different coverage and with numerous exemptions unlike Title VII. Furthermore, under Title VII, jobs can no longer be classified as to sex, except where there is a rational basis for discrimination on the ground of bona fide occupational qualification. The standards in the Equal Pay Act for determining discrimination as to wages, of course, are applicable to the comparable situation under Title VII.

110 Cong.Rec. 7217 (1964).

**11.** The passage reads in its entirety:

Mr. BENNETT. Mr. President, I yield myself 2 minutes.

I call up my amendment No. 1051 and ask that it be read.

The PRESIDING OFFICER. The amendment will be stated.

The legislative clerk read as follows:

On page 44, line 15, immediately after the period, it is proposed to insert the following

new sentence: "It shall not be an unlawful employment practice under this title for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 6(d) of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 206(d))."

Mr. BENNETT. Mr. President, after many years of yearning by members of the fair sex in this country, and after very careful study by the appropriate committees of Congress, last year Congress passed the so-called Equal Pay Act which became effective only yesterday.

By this time, programs have been established for the effective administration of this act. Now, when the civil rights bill is under consideration, in which the work "sex" has been inserted in many places, I do not believe sufficient attention may have been paid to possible conflict between the wholesale insertion of the word "sex" in the bill and in the Equal Pay Act.

The purpose of my amendment is to provide that in the event of conflicts, the provisions of the Equal Pay Act shall not be nullified. I understand that the leadership in charge of the bill have agreed to the amendment as a proper technical correction of the bill. If they will confirm that understand [sic], I

ing the bill, Senator Bennett explained, "The purpose of my amendment is to provide that in the event of conflicts, the provisions of the Equal Pay Act shall not be nullified." Senator Dirksen stated in response, "The Fair Labor Standards Act [Equal Pay Act] carries out certain exceptions. All that the pending amendment does is recognize those exceptions, that are carried in the basic act." *Id.* at 13647. The import of these comments is that the Amendment was merely intended to carry forward the exceptions of the Equal Pay Act. In our analysis we give this passage special significance, as this is the only explanation provided to the body which voted on the Amendment.

The third item is Representative Celler's July 2nd explanation to the House of the changes the Senate made in the House bill, including the Bennett Amendment. There he stated, "Second. [The Senate amendment] [p]rovides that compliance with the Fair Labor Standards Act as amended satisfies the requirement of the title barring discrimination because of sex–section 703(b)." *Id.* at 15896. The district court suggested that this showed that Title VII was meant to be no broader than the Equal Pay Act. *IUE I*, 19 FEP Cases at 454. An equally plausible construction is that compliance with the "equal work" requirements of the Equal Pay Act met Title VII's requirement on that issue only. We are persuaded that Representative Celler must have intended the later interpretation since Title VII proscribes a broad range of gender–based discrimination which is not barred by the Equal Pay Act, such as discriminatory promotions, transfers and firing.

■ Finally, there are two items written after the Civil Rights Act was passed. We view them cautiously as we are mindful of the Supreme Court's warning in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 354, n. 39, 97 S.Ct. 1843, 1864, n. 39, 52 L.Ed.2d 396 (1977), that "[t]he views of the members of a later Congress, concerning different sections of Title VII, enacted after this litigation was commenced, are entitled to little if any weight." The first is a memorandum introduced into the Congressional record by Senator Bennett, in June 1965. The final words of the memorandum state explicitly, "Simply stated, the amendment means that discrimination in compensation on account of sex does not violate Title VII unless it also violates the Equal Pay Act." 111 Cong.Rec. 13359 (1965).[12]

shall ask that the amendment be voted on without asking for the yeas and nays.

Mr. HUMPHREY. The amendment of the Senator from Utah is helpful. I believe it is needed. I thank him for his thoughtfulness. The amendment is fully acceptable.

Mr. DIRKSEN. Mr. President, I yield myself 1 minute.

We were aware of the conflict that might develop, because the Equal Pay Act was an amendment to the Fair Labor Standards Act. The Fair Labor Standards Act carries out certain exceptions.

All that the pending amendment does is recognize those exceptions, that are carried in the basic act.

Therefore, this amendment is necessary, in the interest of clarification.

The PRESIDING OFFICER. (Mr. Ribicoff in the chair). The question is on agreeing to the amendment of the Senator from Utah. (Putting the question.)

The amendment was agreed to.

110 Cong.Rec. 13647 (1964).

**12.** His explanation in full is:

Relation of Title VII to the Equal Pay Act: An Explanation of the Bennett Amendment

Section 703(h) of the Civil Rights Act of 1964 states: "It shall not be an unlawful employment practice under this title for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 6(d) of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 206(d))."

The amendment speaks in terms of a "differentiation * * * authorized by the provisions of section 6(d) of the Fair Labor Standards Act."

Section 6(d) authorizes two things:

1. Wage differentials on equal jobs made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

The amendment therefore means that it is not an unlawful employment practice; (a) to differentiate on the basis of sex in determin-

The plaintiffs have pointed us to a sentence earlier in the memorandum which states that the Amendment merely refers to the exemption of certain employees from Equal Pay Act coverage and to the four exceptions of the Equal Pay Act. They argue that this shows Senator Bennett felt the Amendment referred only to the exceptions.[13] We cannot agree. The final statement is quite explicit and it does support Westinghouse's view. Nevertheless, we are not persuaded that this passage represents the intent of Congress at the time it passed the Amendment. We note that it differs from Senator Bennett's earlier explanation, which was the explanation relied on by the Congressmen who approved the Amendment. Further, there was very little discussion of this *ex post facto* history at the time it was introduced and it was not voted upon. We agree with the Ninth Circuit's interpretation of the significance of this passage. In *Gunther v. County of Washington*, 22 FEP 1650, 1652, 623 F.2d 1303, 1317–18 (9th Cir. 1980), *aff'ing upon petition for rehearing*, 602 F.2d 882 (1979), that court stated:

> As the amendment's sponsor, Senator Bennett's understanding of the amendment might have been entitled to some weight if it had been expressed contemporaneously with the passage of the legislation. *See Galvan v. Press*, 347 U.S. 522, 526–27, 74 S.Ct. 737, 740, 98 L.Ed. 911 (1954). Coming one year after the Bennett Amendment was enacted, however, the statement at best reflects what was on Senator Bennett's mind when he introduced the amendment and is entitled to no weight. See *Manhart v. Los Angeles Department of Power and Water*, 553 F.2d 581, 589 (9th Cir. 1976), aff'd in part and rev'd in part on other grounds, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed. 2d 657 (1978) (discussion occurring "hours" after passage of Bennett Amendment is not part of amendment's legislative history). Either from a legal standpoint or as a practical matter, Senator Bennett's statement cannot express what was on Congress' collective mind when it acted a year earlier. If Senator Bennett's "clarifying" statement has any significance it must be as evidence that the amendment was ambiguous on its face and that its contemporaneous legislative history was not enlightening.

The second item written after the Act was passed is contained in a 1977 Senate Report on amendments to Title VII.[14] The Senate Committee states, "It is the committee's opinion that [an] application of the Bennett Amendment which assumes that the provision insulates from Title VII all compensation and fringe benefit programs which do not also violate the Equal Pay Act is not correct". S. Rep. No. 95–311, 95th Cong., 1st Sess. at 7 (1977). We note the report was written in response to a Supreme Court decision interpreting section 703(h) in a manner which the Senate committee thought was contrary to the view of Congress. The earlier legislative history is

---

ing the compensation of white collar and other employees who are exempt under the provisions of the Fair Labor Standards Act; or (b) to have different standards of compensation for nonexempt employees where such differentiation is not prohibited by the equal pay amendment to the Fair Labor Standards Act.

Simply stated, the amendment means that discrimination in compensation on account of sex does not violate Title VII unless it also violates the Equal Pay Act.

111 Cong.Rec. 13359 (1965).

**13.** *See* note 12, *supra*, for text of memo.

**14.** The Report states in pertinent part:

The Supreme Court seemed to believe, despite apparently contradictory Equal Pay Act regulations, that the discrimination in question in *Gilbert* would be authorized by the Equal Pay Act. See 29 C.F.R. 800.151. It is the committee's opinion that this application of the Bennett amendment which assumes that that provision insulates from Title VII all compensation and fringe benefit programs which do not also violate the Equal Pay Act is not correct; by expressly precluding reliance on section 703(h) in this context, therefore, the committee merely intends to insure that employers may not rely on the Equal Pay Act to prevent the correction of pregnancy discrimination under Title VII.

S.Rep. No. 95–331, 95th Cong., 1st Sess. at 7 (1977).

consistent with the committee's later statement and supports the plaintiffs' position. We, however, have the same difficulty with this passage that we have with Senator Bennett's memorandum. It is *ex post facto*, and it was neither voted upon nor approved by the Congress as a whole. Thus, we do not rely on it.

About the time of the passage of the Bennett Amendment, June 12, 1964, a number of other amendments which would have limited the scope of Title VII, and which would have had a much smaller potential impact on the scope of Title VII's coverage, were rejected by the Senate.[15] Between June 4 and June 17, when the Civil Rights Act was approved by the Senate, twenty-three amendments were rejected. Among them was an amendment to permanently restrict Title VII's coverage to establishments with 100 or more employees (No. 606), 110 Cong.Rec. 13093 (1964); Senator Tower's original testing amendment (No. 605), *id.* at 13505; an amendment requiring that Equal Employment Opportunity Commission (EEOC) employees identify themselves when serving as investigators (No. 963); *id.* at 13650; an amendment expressly permitting EEOC employees to give congressional testimony (No. 922), *id.* at 14193, 14196; an amendment prohibiting the EEOC from withholding any evidence testimony or records from any court or congressional committee (No. 550), *id.* at 13910; and an amendment allowing the EEOC to elect its own chairman and vice chairman, rather than providing for their appointment

by the President (No. 846), *id.* at 13945–46. We think that the congressional opposition to these minor amendments suggests that the Bennett Amendment was not intended to limit Title VII's coverage as Westinghouse urges for the Amendment probably would have been more widely disputed and discussed if that was the intent. Again, this evidence is not decisive to our decision, but it supports the plaintiff's interpretation.

In summary we conclude that the legislative history shows that the Bennett Amendment merely incorporated the four exceptions of the Equal Pay Act into Title VII without otherwise limiting Title VII's coverage.

### E.

■ The third group of materials we have used to unravel the meaning of the Bennett Amendment are the regulations and rulings of the EEOC, the regulatory body charged with enforcing the Civil Rights Act. The EEOC's regulations, issued in 1972, make it quite explicit that "the prohibitions against discrimination based on sex contained in Title VII is co-extensive with that of the other prohibitions contained in Title VII and is not limited by Section 703(h) to those employees covered by the Fair Labor Standards Act". 29 C.F.R. § 1604.8 (1978).[16]

The district court discounted these regulations because it felt that the regulations were inconsistent with earlier EEOC regu-

---

15. On June 9, the Senate debated and rejected Amendments 606 and 898. 110 Cong.Rec. 13085, 13093 (1964). On June 22, the Senate debated and rejected Amendments 569 and 605. *Id.* at 13492, 13505. On June 12, the Senate debated and rejected Amendments 607 and 962. *Id.* at 13648–52. On June 13, the Senate debated and rejected Amendment 963. *Id.* at 13650, 13696. On June 15, the Senate debated and rejected Amendments 519 and 547. *Id.* at 13825–26 and 13838. On June 16, the Senate debated and rejected Amendments 550, 846, 855, and 1020. *Id.* at 13910 and 13943–46. On June 17, the Senate debated and rejected Amendments 590, 847, 922, 1021, 1022, 1023 and 1024. *Id.* at 14179, 14182–83, 14186–87, 14191–93, and 14196–97.

16. 29 C.F.R. § 1604.8 (1978) provides in full:

Relationship of Title VII to the Equal Pay Act.

(a) The employee coverage of the prohibitions against discrimination based on sex contained in Title VII is coextensive with that of the other prohibitions contained in Title VII and is not limited by Section 703(h) to those employees covered by the Fair Labor Standards Act.

(b) By virtue of Section 703(h), a defense based on the Equal Pay Act may be raised in a proceeding under Title VII.

(c) Where such a defense is raised, the Commission will give appropriate consideration to the interpretations of the Administrator, Wage and House Division, Department of Labor, but will not be bound thereby.

lations issued in 1965. It was the district court's view that the 1965 regulations stated that the discriminatory wage scales were impermissible only if the wage scales were also in violation of the Equal Pay Act. 19 FEP Cases 454–56. The court held that earlier regulations were controlling, relying on *General Electric v. Gilbert.*[17] In *Gilbert* the Supreme Court found that the EEOC's newer regulations covering pregnancy benefits "flatly contradict[ed] the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute." 429 U.S. at 142, 97 S.Ct. at 411. It held that the newer regulations were therefore not entitled to the deference normally afforded EEOC regulations. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 855, 28 L.Ed.2d 158 (1971). ("interpretation of the Act by the [EEOC] is entitled to great deference.")

The rule set forth in *General Electric v. Gilbert* is not applicable to these regulations. The 1965 regulations stated that "with respect to situations to which both statutes are applicable . . . the standards of the 'equal pay for equal work' set forth in the Equal Pay Act" are applicable to Title VII. 30 Fed.Reg. 14928 (1965). They do not state that Title VII's scope is no broader than the Equal Pay Act. Indeed, the regulation specifically provides that "discrimination in compensation because of sex is co-extensive with that of the other prohibition in section 703, and is not limited by section 703(h) to those em-

ployees covered by the Fair Labor Standards Act." *Id.* Second, and most important, the EEOC, in a number of cases decided before the 1972 guidelines were issued, found Title VII applicable to situations where the wage rates for jobs held predominately by women were set lower than the wage rates for jobs held predominantly by men. In these cases the wage rates were lower because the jobs were held predominantly by women and not because of the job requirements. *See, e. g.,* Decision No. 70–112, 1973 EEOC Decisions (CCH) ¶ 6108 (Sept. 5, 1969); Decision No. 70–695, 1973 EEOC Decisions (CCH) ¶ 6148 (April 13, 1970). The EEOC's position has been generally consistent and thus the traditional deference which courts give to agency regulations is to be given in this case. *See United States v. National Association of Securities Dealers, Inc.,* 422 U.S. 694, 719, 95 S.Ct. 2427, 2442, 45 L.Ed.2d 486 (1975) (courts will give "considerable weight" to a "consistent and longstanding interpretation by the agency charged with administration of" that statute). Thus, we find that the EEOC regulations also support the plaintiffs construction.

### F.

The caselaw, for the most part, adds little to our inquiry. The Supreme Court's references to the Equal Pay Act in the context of Title VII are inconclusive and only one decision by a Court of Appeals has squarely faced the issue raised in this appeal. In

17. The 1965 regulations provided:

(a) Title VII requires that its provisions be harmonized with the Equal Pay Act (section 6(d) of the Fair Labor Standards Act of 1938, 29 U.S.C. 206(d)) in order to avoid conflicting interpretations or requirements with respect to situations to which both statutes are applicable. Accordingly, the Commission interprets section 703(h) to mean that the standards of "equal pay for equal work" set forth in the Equal Pay Act for determining what is unlawful discrimination in compensation are applicable to Title VII. However, it is the judgment of the Commission that the employee coverage of the prohibition against discrimination in compensation because of sex is co-extensive with that of the other prohibitions in section 703, and is not limited

by section 703(h) to those employees covered by the Fair Labor Standards Act.

(b) Accordingly, the Commission will make applicable to equal pay complaints filed under Title VII the relevant interpretations of the Administrator, Wage and Hour Division, Department of Labor. These interpretations are found in 29 Code of Federal Regulations, Part 800 119–800.163. Relevant opinions of the Administrator interpreting "the equal pay for equal work standard" will also be adopted by the Commission.

(c) The Commission will consult with the Administrator before issuing an opinion on any matter covered by both Title VII and the Equal Pay Act.

30 Fed.Reg. 14928 (1965).

that case, *Gunther v. County of Washington,* the Ninth Circuit held that Title VII was violated when wages for females were intentionally set, on the basis of sex, lower than wages for men who held different jobs. We find the *Gunther* decision to be persuasive and note that that court's interpretation of the Bennett Amendment's legislative history is consistent with out own.[18] The Tenth Circuit in a different factual setting held in *Lemons v. Denver,* 620 F.2d 228 (10th Cir. 1980), that Title VII did not prevent sex discrimination in wages for comparable jobs. We note that *Lemons* is distinguishable because the lower court found that the city had not set the wages for women lower than the wages for men on account of their sex. " 'The City draws no distinction between male and female employees.' " 620 F.2d at 229 (quoting the district court's findings). The other cases in both the Courts of Appeals, including this circuit, and the district courts are not helpful because the issue raised by this case was not decided and thus only address this issue in dicta.[19]

## IV.

■ With the Civil Rights Act of 1964, Congress released a strong and forceful weapon against employment discrimination. To paraphrase the Supreme Court's words: "It would be ironic indeed if [the Equal Pay Act,] a law triggered by a Nation's concern over centuries of [sexual discrimination] and intended to improve the lot of those who had 'been excluded from the American dream for so long' " were to lead to the contraction of their rights under Title VII. *United Steelworkers of America v. Weber,* 443 U.S. 193, 204, 99 S.Ct. 2721, 2728, 61 L.Ed.2d 480 (1979), *quoting* Senator Humphrey, 110 Cong.Rec. 6552 (1964). Nothing we have found suggests that this act was to be weakened so as to "authorize" the explicit discrimination in compensation the plaintiffs assert that Westinghouse has practiced. Moreover, we believe that the evidence suggests otherwise.

**18.** Although it is not important to our decision, the facts of *Gunther* demonstrate the difficulty with Westinghouse's interpretation. The plaintiffs were female matrons and prison guards who asserted that they were paid lower wages than the male prison guards on account of their sex. Earlier in *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the Supreme Court had held that sex was a bona fide occupational qualification for the position of a prison guard and therefore women could lawfully, under certain circumstances, be excluded from the positions held by men. Had the Ninth Circuit found that Title VII permitted the alleged wage discrimination, the women may have been left without redress. They could neither sue for higher wages nor could they try to transfer to the higher paying jobs to escape the alleged discrimination practices of the city.

**19.** In some of the cases the courts did not reach the issue, but in dicta viewed the Bennett Amendment as being limited to the four exceptions. *E. g., Manhart v. City of Los Angeles Dept. of Power & Water,* 553 F.2d 581, 587–88 (9th Cir. 1976), *aff'd and rev'd on other grounds,* 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978); *Fitzgerald v. Sirloin Stockade, Inc.,* 22 FEP Cases 262, 267, 624 F.2d 945 (10th Cir. 1980); *EEOC v. Aetna Insurance Co.,* 616 F.2d 719, 724 n. 5 (4th Cir. 1980) (Equal Pay Act claim only); *Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 446 (D.C.Cir.1976),

*cert. denied,* 434 U.S. 1086, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978). In other cases, the courts stated in dicta that Title VII is limited to equal work challenges. *E. g., DiSalvo v. Chamber of Commerce of Greater Kansas City,* 568 F.2d 593, 596 (8th Cir. 1978); and *Orr v. Frank R. MacNeil & Son, Inc.,* 511 F.2d 166, 171 (5th Cir. 1975), *cert. denied,* 423 U.S. 865, 96 S.Ct. 125, 46 L.Ed.2d 94 (1975). As we have noted, the issue has generally not been directly confronted for adjudication on a record similar to the present one. A variety of reasons may explain this. In some instances, the claimant met the equal work claim and there would have been no need to decide any other approach. *E. g., Shultz v. Wheaton Glass Co.,* 421 F.2d 259, 266 (3d Cir.), *cert. denied,* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970); and *Roesel v. Joliet Wrought Washer Co.,* 596 F.2d 183, 184–86 (7th Cir. 1979); *DiSalvo,* 568 F.2d at 596–97; and *Laffey,* 567 F.2d at 445. In some cases the plaintiff failed to meet the equal work standard and the facts suggest the plaintiff would not have been able to establish facts similar to the facts of this case. *E. g., Keyes v. Lenoir Rhyne College,* 552 F.2d 579 (4th Cir.), *cert. denied,* 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977); *Calage v. University of Tennessee,* 544 F.2d 297 (6th Cir. 1977); *Orr.* Finally, in some of the cases the plaintiffs never sought to challenge the equal work standard. *E. g., DiSalvo; Calage; Manhart.*

Accordingly, we will reverse the judgment of the district court and will remand for further proceedings.[20]

VAN DUSEN, Circuit Judge, dissenting.

I respectfully dissent. The majority opinion describes a case in which sex–based wage discrimination and liability under § 703(a)(1) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) (1976), will be established by evidence that an express policy of sex–based wage discrimination exists at Westinghouse's Trenton facility.[1] If I understood the case to involve only this issue, I would join in the court's order.[2] However, I understand the Union to be asking this court to adopt the position that a plaintiff can prove a claim under Title VII on a sex–based wage discrimination theory through comparisons of the worth of comparable work; that is, through comparisons of the value of different jobs to the wages paid for performing those jobs. Since I believe Congress adopted the Bennett Amendment, which is included in § 703(h) of Title VII, 42 U.S.C. § 2000e–2(h), to prevent plaintiffs from proving sex–based wage discrimination claims under Title VII with evidence of the worth of comparable work, I dissent.

I.

As I understand the record in this case, the Union's case can only be proved through

**20.** We make no judgment as to whether, on the merits, the plaintiffs will be able to sustain their burden of proof. We rule merely that they must be given the opportunity to present the case to a fact–finder to evaluate their evidence.

**1.** The majority's language also describing plaintiffs' claim as a § 703(a)(2), § 2000e–2(a)(2), "classification" case is inaccurate. The plaintiff's complaint includes five counts. Each count alleges a § 703(a)(1), § 2000e–2(a)(1), compensation violation. A § 703(a)(2) classification violation is nowhere mentioned in the plaintiffs' papers (8a–33a).

**2.** The majority's belief that Title VII must be read more broadly than the Equal Pay Act in order that certain sex–based wage discrimination not go unremedied is open to question. The Equal Pay Act states:

"No employer . . . shall discriminate . . . between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions . . . ."

The majority implies that an employer, who explicitly states that he is paying a group of his female employees less than he would if they were males, is not liable under the Equal Pay Act so long as no male employees performing *substantially equivalent work exist. I believe that the Equal Pay Act does prohibit such sex–based wage discrimination. It is not necessary that every Equal Pay Act violation be established through proof that members of the opposite sex are currently performing equal work for greater pay. Although the typical Equal Pay case involves a claim that men and women are working contemporaneously at the same job for disparate compensation, the courts have also found Equal Pay violations by looking to the wages paid the predecessors or successors of plaintiffs. *Bourque v. Powell Electrical Manufacturing Co.,* 617 F.2d 61 (5th Cir. 1980) (violation of Equal Pay Act and Title VII established by comparison with wage of predecessor and statements of intent to engage in sex–based wage discrimination), and *DiSalvo v. Chamber of Commerce,* 568 F.2d 593 (8th Cir. 1978) (violation of Equal Pay Act and Title VII established by comparison with wage of successor). I interpret an employer's statement, "if my female employees were males, I would pay them more," as an admission that men performing equal work, with the same qualifications, in the same working conditions, would be paid more than the current female employees. This situation is covered by the Equal Pay Act. The hypothetical males referred to by the employer suffice as the better paid employees of the opposite sex required by the statute. To require the female employees to wait until better paid male successors are in fact hired by the employer before bringing a claim would be manifestly unjust. I am confident that Congress did not intend such overt discrimination to go unremedied by the Equal Pay Act. I believe that the majority's reliance on the inability of the Equal Pay Act to accommodate this situation is unjustified.

The only case which I have found addressing this question is *Rinkel v. Assoc. Pipeline Contractors,* 17 FEP Cases 224, 226 (D.Alaska 1978). The district court in *Rinkel* concluded that in order to establish liability under the Equal Pay Act it was necessary that a member of the opposite sex actually perform equal work, despite explicit statements of intent to discriminate in wages on the basis of sex by the employer. I do not believe the court adequately considered the policies of the Equal Pay Act in reaching this conclusion and was in error.

evidence of the worth of comparable work. The 'Union's sole evidence of an express policy of discrimination at the Trenton facility is a statement from 1939. Although the Union acknowledges that there have been changes in the content of the various jobs and adjustments to the pay scales over the last 40 years,[3] they argue that, with comparable work evidence, they can prove that the 1939 policy has been perpetuated. They state that "[j]ob comparisons would play only a limited role in plaintiff's proof—establishing that discriminatory wage reductions for women first instituted by Westinghouse some forty years ago have not been eliminated with the passage of time, and that the present system still embodies intentional discrimination."[4] Although the Union downplays the importance of the comparable work evidence, it is the sole evidence available to them to demonstrate that the discrimination has continued. Thus, the evidence of comparable work will be the central focus of the Union's case.[5]

Accordingly, the question presented by this case is whether a sex–based wage discrimination claim can be made out under Title VII on the basis of evidence of compa-

**3.** Brief for appellants at 10.

**4.** Appellants' Reply Brief at 6.

**5.** The Union explained its proposed method of proof and the importance of comparable work evidence in response to the defendant's interrogatories, as follows:

"The low rates for all female jobs–including the few classified above Labor Grade 3–are not justified by the nature and content of the jobs, but are solely the result of sex discrimination. *Plaintiffs will establish this fact by expert testimony after further discovery and investigation, and it is not possible to describe at this point the comparisons which plaintiffs will make at trial between various jobs. However, examples of job comparisons which plaintiffs would make on the basis of their present knowledge are contained in the answers to Interrogatories Nos. 11–16.*"

(69a, emphasis added.)

An example of the job comparisons to be made is set out in answer to Interrogatory No. 12.

"[O]n the basis of their present knowledge, plaintiffs would compare the Mount Machine Operator and the Janitor jobs in the following terms relevant to their claim that the job of Mount Machine Operator is discriminatorily underpaid:

"A Mount Machine Operator must work at a fast pace feeding flares, coils, wires and exhaust tubing into her machine. This demands great skill and dexterity, especially the coil feeding. The operator must be able to work from a schedule sheet, must notify other personnel of type changes and the anticipated time of changeovers, must keep production records, must analyze and record shrinkage, and must take note of irregularities in the machine's operation and in the materials she receives. The operator must clear jams and remove defective parts with tweezers, relight fires, and do other such maintenance functions. The job entails several other duties: traying the finished mounts, stamping and counting flimsies, cleaning machine parts, pushing bulb hampers to the .sealex position, dumping glass particles into a cullet box and pushing the box to the aisle and stocking it for the cullet collector to empty, repairing defective *mounts, delivering trayed mounts to the sea-* lex position, obtaining materials, sweeping the work area, etc. Much of this work is heavy; for example, the lifting of heavy boxes of flares and tubes, and the moving of even heavier cullet boxes and bulb hampers. The work is constant, and involves tension and pressure, since the operator must keep up with the machine and the plant's production depends on the operator's ability to keep the machine fed and running, and to identify problems in the operation of the machine as well as defects in the materials which go into the machine and the mounts which come out of it.

"In contrast, the Janitor job involves virtually no skill. Moreover, the janitors can work at a leisurely pace, and often have no duties to perform for substantial periods of time. And of course, the performance of the janitors does not have a direct effect on production, unlike the Mount Machine job. Furthermore, for the most part the janitor's work is very light. Janitors have seldom *been required to sweep the factory areas* (except the warehouse janitor), because this work is done by the operators in the areas. Thus the sweeping done by janitors is generally confined to offices, wash rooms, stairways, cafeteria, etc. The cleaning done by the janitors is of a light nature, requiring little exertion. The same is true of the janitors' duties with respect to emptying cigarette containers, wastepaper baskets, etc. And equipment such as powered sweepers and automatic hand tracks minimize the effort required in the few areas where the work might otherwise be heavy."

(75a–77a)

rable work. Because I believe the Bennett Amendment attempts to incorporate into Title VII the Equal Pay Act's rejection of the comparable work approach, I conclude the answer to the question is no.[6]

## II.

The proper analysis of the question begins with an understanding of Congress' position on comparable work in the Equal Pay Act. It is clear from the legislative history of the 1963 Equal Pay Act amendment to the Fair Labor Standards Act of 1938, 29 U.S.C. § 206(d), that Congress rejected the comparable work doctrine at that time. *Angelo v. Bacharach Instrument Co.*, 555 F.2d 1164, 1173–76 (3d Cir. 1977). Congress did not want and "did not authorize the Secretary [of Labor] or the Courts to engage in wholesale reevaluation of any employer's pay structure in order to enforce their own conceptions of economic worth." *Brennan v. Prince William Hospital Corp.*, 503 F.2d 282, 285 (4th Cir. 1974), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975). Congress rejected the doctrine at least in part due to the difficulty of ascertaining the worth of comparable work and the difficulty of ascertaining the impact on wages of the supply and demand for labor.[7] The determination of proper wages when equal work did not exist was deemed better left to the market place than to a judicial fact finder.

One year later the same Congress passed the Civil Rights Act of 1964, a broad anti–discrimination statute prohibiting, *inter alia*, sex discrimination in employment. It is a general principle of statutory construc-tion that legislation addressing the same issue be interpreted *in pari materia* if possible. The Supreme Court has held that under this canon, "a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum. 'Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.'" *Radzanower v. Touche, Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989, 1992, 48 L.Ed.2d 540 (1976), *quoting Morton v. Mancari*, 417 U.S. 535, 550–51, 94 S.Ct. 2474, 2482–83, 41 L.Ed.2d 290 (1974). The canon has elsewhere been defined to mean that:

> "In terms of legislative intent, it is assumed that whenever the legislature enacts a provision it has in mind previous statutes relating to the same subject matter, wherefore it is held that in the absence of any express repeal or amendment therein, the new provision was enacted in accord with the legislative policy embodied in those prior statutes, and they all should be construed together."

2A C. Sands, *Sutherland Statutory Construction* § 51.02 (4th ed. 1973) (footnotes omitted).

In my opinion, the Equal Pay Act and Title VII should be construed *in pari materia*. They both deal with the same subject matter, sex–based wage discrimination. The Equal Pay Act deals solely with sex–based wage discrimination and was enacted after extensive legislative investigation of the issue. Title VII, by contrast, is general anti–discrimination legislation and was

---

**6.** Even if the majority's perception of this case, that it raises only the question of whether sex–based wage discrimination can be proved by way of statements of intentional wage discrimination in the absence of an equal work violation, is correct, the majority's analysis will permit sex–based wage discrimination claims to be brought solely on the basis of evidence of comparable work. By interpreting the Bennett Amendment to refer only to the four exceptions in the Equal Pay Act and by holding that Title VII need not be read *in pari materia* with the Equal Pay Act, the majority has necessarily decided that Title VII's prohibition against sex discrimination in wages is not limited by the Equal Pay Act's equal work requirement. Accordingly, we must confront the comparable work issue in this case.

**7.** The difficulty of ascertaining the proper wage for a job by comparing it to the wage paid for dissimilar work has been well documented. *See Christensen v. Iowa*, 563 F.2d 353, 356 (8th Cir. 1977), and Lindsay, *Equal Pay for Comparable Work: An Economic Analysis of a New Antidiscrimination Doctrine* (1980), published by the Law and Economics Center of the University of Miami.

passed without investigation of the specific problem of sex–based wage discrimination. In Title VII there is no express repeal of the equal work requirement of the Equal Pay Act. Rather, the legislative history of Title VII shows an actual intent by the floor leaders of the legislation to avoid conflicts between the two statutes. In fact, Title VII expressly refers to the Equal Pay Act and attempts to harmonize the two statutes through the Bennett Amendment.

Further support for construing the statutes *in pari materia* is found in the EEOC's contemporaneous agency regulation, 29 C.F.R. § 1604.7(a) (1965). It expressly stated that "Title VII requires that its provisions be harmonized with the Equal Pay Act (section 6(d) of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206(d)) in order to avoid conflicting interpretations or requirements with respect to situations to which both statutes are applicable." The current EEOC regulations also include a provision expressly addressing the relationship between Title VII and the Equal Pay Act, 29 C.F.R. § 1604.8 (1978). Moreover, every court of appeals which has addressed the question of the applicability of the *in pari materia* canon to the interpretation of these statutes, including a prior decision of the Third Circuit, has held that the canon does apply. *Shultz v. Wheaton Glass Co.*, 421 F.2d 259, 266 (3d Cir.), *cert. denied*, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970); *DiSalvo v. Chamber of Commerce*, 568 F.2d 593, 596 (8th Cir. 1978); *Laffey v. Northwest Airlines, Inc.*, 567 F.2d 429, 446 (D.C.Cir.1976); and *Orr v. MacNeill & Sons, Inc.*, 511 F.2d 166, 170 (5th Cir.), *cert. denied* 423 U.S. 865, 96 S.Ct. 125, 46 L.Ed.2d 94 (1975). All of these factors lead me to conclude that the canon is applicable to the issue in this case and requires us to interpret Title VII in a fashion consistent with the Equal Pay Act's rejection of the comparable work doctrine.

It is from this foundation that I begin my analysis of the Bennett Amendment. The Bennett Amendment provides as follows:

"It shall not be an unlawful employment practice under this title for any employer to differentiate upon the basis of sex in determining the amount of wages or compensation paid or to be paid employees of such employer, if such differentiation is authorized by the provisions of [the Equal Pay Act] Section 6(d) of the Fair Labor Standards Act of 1938, as amended (29 U.S.C. 206(d))."

This provision was added in response to Congressman Smith's amendment, which included sex in the classifications protected under § 703(a)(1) of Title VII, 42 U.S.C. § 2000e–2(a)(1), from employment discrimination.

As the majority discusses extensively, the dispute in interpreting the Bennett Amendment concerns the meaning of the word "authorized" in the phrase "authorized by the provisions of Section 6(d) of the Fair Labor Standards Act of 1938." The majority notes that the word "authorized" is open to two interpretations. It may refer to the four exceptions expressed in the Equal Pay Act, as the majority concludes, or it may limit the prohibition against sex–based wage discrimination to situations where the Equal Pay Act is also violated, thus preventing the use of comparable work evidence. A review of the aids to interpretation leads me to the latter conclusion.

### A.

Statutory construction begins with an analysis of the language of the statute. *Lewis v. United States*, 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980). The word "authorized" normally describes something that is affirmatively endorsed. However, as Westinghouse argues, an alternative definition is "to permit a thing to be done in the future."[8] I do not believe the common meaning of the word is so clear as to reveal conclusively the correct interpretation of the statute.

Moreover, the majority's definition of "authorized" renders the Bennett Amendment largely redundant, a construction

8. Black's Law Dictionary (4th ed. 1968) at 169.

which is to be avoided. *F. A. A. v. Robertson*, 422 U.S. 255, 261, 95 S.Ct. 2140, 2145, 45 L.Ed.2d 164 (1975). Section 703(h) of Title VII, § 2000e–2(h), contains two sentences. The Bennett Amendment is the second sentence. The first sentence explicitly provides that "it shall not be an unlawful employment practice for an employer to apply different standards of compensation . . . pursuant to a bona fide seniority or merit system or a system which measures earning by quantity or quality of production . . . ." Nonetheless, the majority views the Bennett Amendment as solely incorporating the following provision under the Equal Pay Act: "[n]o employer . . shall discriminate . . . [on the basis of wages] . . . except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex . . . ." In light of the first sentence of § 703(h), the majority's interpretation makes the Bennett Amendment surplusage. Based on these factors, I believe the statutory language itself is inconclusive.

### B.

The second aid to interpretation is the legislative history. Two days after Congressman Smith's amendment to Title VII including sex as a protected classification was adopted, the bill passed the House. The bill bypassed the Senate committee system and was presented to the full Senate for initial consideration. The first discussion of the issue of discrimination in compensation based on sex was presented on April 4, 1964, by Senator Clark, one of the bill's floor managers, in response to questions raised by Senator Dirksen. Senator Clark posed the following question and answer:

> "Objection: The sex antidiscrimination provisions of the bill duplicate the coverage of the Equal Pay Act of 1963. But more than this, they extend far beyond the scope and coverage of the Equal Pay Act. *They do not include the limitations in that act with respect to equal work on jobs requiring equal skills in the same establishments, and thus, cut across different jobs.*

> "Answer: The Equal Pay Act is a part of the wage hour law, with different coverage and with numerous exemptions unlike title VII. Furthermore, under title VII, jobs can no longer be classified as to sex, except where there is a rational basis for discrimination on the ground of bona fide occupational qualification. *The standards in the Equal Pay Act for determining discrimination as to wages, of course, are applicable to the comparable situation under title VII.*"

110 Cong.Reg. 7217 (1964) (emphasis added). As I read the emphasized portions of the question and answer, they demonstrate an intent to preserve the Equal Pay Act's requirement that proof of equal work be a prerequisite to a sex–based wage discrimination claim under Title VII.

Subsequently, on June 12, 1964, the Bennett Amendment was introduced in the Senate. The colloquy at the time of introduction and adoption is somewhat ambiguous.[9] Senator Bennett summarized the import of his amendment by saying:

> "Now, when the civil rights bill is under consideration, in which the word 'sex' has been inserted in many places, I do not believe sufficient attention may have been paid to possible conflict between the wholesale insertion of the word 'sex' in the bill and in the Equal Pay Act.

> "The purpose of my amendment is to provide that in the event of conflicts, the provisions of the Equal Pay Act shall not be nullified."

110 Cong.Rec. 13647 (1964). This statement is open to different interpretations because Senator Bennett did not specify the provisions of the Equal Pay Act to which he was referring. I believe, however, the most log-

---

**9.** The text of the colloquy at the time of introduction and adoption is set forth at note 11 of the majority opinion.

ical interpretation of the statement is that Senator Bennett was referring to the equal work provisions of the Equal Pay Act.[10]

The Senate's amendment was then sent to the House for approval. In the House Congressman Celler, floor leader of the bill, explained that the Bennett Amendment "provides that compliance with the Fair Labor Standards Act as amended satisfies the requirements of the title [Title VII] banning discrimination because of sex." 110 Cong.Rec. 15896 (1964). As the majority notes, this statement also is open to varying interpretations. Again, I believe that the most logical interpretation of this remark is that complying with the Equal Pay Act would preclude liability under Title VII for all sex–based wage discrimination claims. The House adopted the provision and the bill was eventually enacted into law.

One year later, in 1965, Senator Bennett submitted a memorandum to be published in the Congressional Record clarifying the meaning of his amendment. The final words of the memorandum are that "[s]imply stated, the amendment means that discrimination in compensation on account of sex does not violate Title VII unless it also violates the Equal Pay Act." 111 Cong.Rec. 13359 (1965).[11] As the majority notes, this statement explicitly supports Westinghouse's view. Although I am aware of the danger of relying on legislative history which is presented after passage of a law, the Supreme Court cases do not dismiss such history as irrelevant. *Haynes v. United States*, 390 U.S. 85, 87 n.4, 88 S.Ct. 722, 725 n.4, 19 L.Ed.2d 923 (1968); *Galvan v.*

*Press*, 347 U.S. 522, 526–27, 74 S.Ct. 737, 740, 98 L.Ed. 911 (1954); and *Sioux Tribe v. United States*, 316 U.S. 317, 329–30, 62 S.Ct. 1095, 1100–01, 86 L.Ed. 1501 (1942). When the author of a piece of legislation, a short time after its passage, makes a clarifying statement which is not inconsistent with the prior, ambiguous legislative history, I believe the statement should be given weight.[12] In this case it lends support to Westinghouse's interpretation. In sum, when considered in full, I believe the legislative history supports Westinghouse's view.

### C.

The third aid to interpretation is the administrative interpretation of the statute by the Equal Employment Opportunity Commission (EEOC), the regulatory body charged with enforcing the Civil Rights Act. The situation before us parallels that presented to the Supreme Court in *General Electric Co. v. Gilbert*, 429 U.S. 125, 142, 97 S.Ct. 401, 411, 50 L.Ed.2d 343 (1976). In *Gilbert* the Supreme Court discounted the weight to be given EEOC's 1972 Title VII regulations addressing pregnancy benefits, because they were inconsistent with EEOC's 1965 regulations on the issue. In this case the EEOC also amended its regulations in 1972. At that time the EEOC omitted the express requirement of proof of equal work articulated in the 1965 regulation concerning the Bennett Amendment.[13] The current regulation is silent concerning the equal pay requirement, and thus sheds

---

**10.** Senator Dirksen's statement, which is relied on by the majority, is also ambiguous. Senator Dirksen said, "all that the pending amendment does is recognize those exceptions, that are carried in the basic act." It is unclear what "the basic act" refers to. Moreover, it was Senator Dirksen who first raised the objection, answered by Senator Clark, that Title VII would reject the equal work requirement. These facts leave the majority's interpretation open to question.

**11.** The full text of the statement is set out in the majority opinion at note 12 at p. 1103.

**12.** *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 354 n. 39, 97 S.Ct. 1843, 1864 n. 39, 52 L.Ed.2d 396 (1977), is not to the contrary. It states in pertinent part:
"The views of members of a later Congress, concerning different sections of Title VII, enacted after this litigation was commenced, are entitled to little if any weight. It is the intent of the Congress that enacted § 703(h) in 1964, unmistakable in this case, that controls."

**13.** The full text of the two regulations is set forth in the majority opinion at notes 16 and 17 at pp. 1105–1106.

little light on the issue presented by this case.[14] Despite this, recent EEOC rulings and the amicus brief filed in this court demonstrate that the EEOC currently supports the Union's position that the Bennett Amendment does not incorporate the equal work requirement into Title VII. The prior regulation, however, clearly supported Westinghouse's position. The 1965 regulation stated in part that, "the Commission interprets section 703(h) to mean that the standards of 'equal pay for equal work' set forth in the Equal Pay Act for determining what is unlawful discrimination in compensation are applicable to Title VII." 29 C.F.R. § 1604.7(a) (1965). This regulation shows that in 1965 the EEOC believed that the Bennett Amendment incorporated the equal work requirement into Title VII. Although the recent rulings may stand as some authority for the Union's position, in light of *Gilbert*, at 143, 97 S.Ct. at 411, I believe their weight is substantially reduced, and that this 1965 regulation should be considered.

### D.

The case law is the last aid to interpretation. It has been reviewed extensively by both the majority and the district court, *International Union of Electrical Workers v. Westinghouse Electric Co.*, 19 F.E.P. Cases 450 (D.N.J.1979). Their reviews demonstrate that there is a conflict between the circuits on the issue currently in controversy. Until the decision in *Gunther v. County of Washington*, 602 F.2d 882 (9th Cir. 1979), *aff'd upon petition for rehearing*, 623 F.2d 1303 (9th Cir. 1980), no court of appeals had held that a Title VII claim of sex–based

wage discrimination could be made out without proof of equal work. The opposite position had uniformly been taken. *Lemons v. Denver*, 620 F.2d 228 (10th Cir. 1980); *Orr v. MacNeill & Sons, Inc.*, 511 F.2d 166, 171 (5th Cir.), *cert. denied*, 423 U.S. 865, 96 S.Ct. 125, 46 L.Ed.2d 94 (1975); *Ammons v. Zia Co.*, 448 F.2d 117, 120 (10th Cir. 1971) (Aldisert, J., sitting by designation); and *Keyes v. Lenoir Rhyme College*, 15 F.E.P. Cases 914 (W.D.N.C.1976), *aff'd*, 552 F.2d 579 (4th Cir.), *cert. denied*, 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977). Although the *Gunther* opinion treats the problem in more detail than the other cases, it fails to discuss the application of the *in pari materia* canon of statutory construction to the issue. This failure undermines the force of the Ninth Circuit's analysis. In light of this review, I consider the case law another factor in support of Westinghouse's interpretation.

In sum, I believe that when all the aids to interpretation are considered and when the canon of *in pari materia* is given proper weight, Westinghouse's interpretation of the Bennett Amendment must prevail.[15]

### III.

In conclusion, I note that read together, Title VII and the Equal Pay Act provide a balanced approach to resolving sex–based wage discrimination claims. Title VII guarantees that qualified female employees will have access to all jobs, and the Equal Pay Act assures that men and women performing the same work will be paid equally. This approach provides a mechanism for eliminating sex–based wage discrimination, while, at the same time, assuring that the

---

14. The majority reads 29 C.F.R. § 1604.8(a) (1978) as eliminating the equal work requirement. I understand this subsection to address solely the question of which employees are covered under Title VII and the Equal Pay Act. Title VII protects some workers not protected by the Equal Pay Act. Section 1604.8(a) merely says that the Bennett Amendment does not serve to limit the coverage of Title VII to those employees covered by the Equal Pay Act.

15. The majority holds that the *in pari materia* canon is inapplicable to the case at bar. I believe this view leads it to interpret the Bennett Amendment incorrectly. However, even if the majority's limited interpretation of the Bennett Amendment is correct, I believe the *in pari materia* canon compels us to interpret Title VII to include an equal work requirement in sex–based wage discrimination claims, since the Congress in Title VII did not expressly reject the equal work requirement.

courts and federal agencies will not become entangled in adjudicating the wage rates to be paid for dissimilar jobs–a process in which they have little expertise. The majority's opinion rejects this balanced approach and will allow claims based on the valuation of comparable work. Although the majority's opinion is purportedly limited to cases involving express statements of discrimination, its analysis is not so limited. In order to find a sex–based wage discrimination cause of action under Title VII where one does not exist under the Equal Pay Act, the majority has interpreted the Bennett Amendment to refer only to the four exceptions in the Equal Pay Act and, by not following the canon of *in pari materia,* has rejected the applicability of the policies of the Equal Pay Act to Title VII. Having disposed of both of these limitations on the scope of Title VII, this court has no basis under which to exclude evidence of the worth of ·comparable work in a Title VII sex–based wage discrimination case.[16] I do not believe Congress intended to overrule the equal work policy of the Equal Pay Act in adopting Title VII, and accordingly I dissent.[17] I would affirm the district court's order.

---

**16.** As noted above in part I, I believe this is such a case.

**17.** My analysis of the limitation of Title VII in the area of sex–based wage discrimination in no way implies that I am unsympathetic to the employment discrimination suffered by many women. While I view such discrimination as a deep–rooted social problem which can and should be remedied, I think the change must come from the legislature. My review of the legislative history convinces me that in passing the Civil Rights Act of 1964 the 88th Congress did not intend to subject employers to liability on claims based on the valuation of comparable work. In light of the still great disparities between the wages of men and women 16 years after the enactment of the Civil Rights Act, Congress may now wish to pass legislation allowing comparable work claims to be brought under Title VII.